CLERK'S OFFICE
A TRUE COPY
Sep 29, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
The premises located at 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202, including any electronic devices located therein, as described in Attachment A

Case No. 26-MJ-528 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before October 13, 2026 *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: September 29, 2026 10:20 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ________________

______________________________

*Executing officer's signature*

______________________________

*Printed name and title*

## **ATTACHMENT A**

*Property to Be Searched*

The residence located at 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202, including any cellular devices or computers located on-site, and including any storage units on-site to which SAVANAH JUG has access.

## ATTACHMENT B

*Items to be Seized*

1. All records relating to violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), and Title 26, United States Code, Sections 7201 (evasion of assessment) and 7206(1) (false returns), those violations involving Savannah Jug, Jennifer Shields, David Juarez, and/or Julie Gardner, and others known and unknown, since January 1, 2022, including but not limited to:

   a. Banking records for any account used by or associated with the subjects or entities involved in the scheme, including account statements, checks, wire/ACH documentation, cashier's checks, money orders, deposit/withdrawal slips, loan documents, balance notes, and related financial materials.

   b. Documents showing the receipt, movement, concealment, transfer, or expenditure of funds, including ledgers, notebooks, spreadsheets, handwritten notes, receipts, and records of Apple Cash, CashApp, Zelle, Venmo, or similar payment platforms.

   c. Records relating to the financing or purchase of vehicles or real estate properties.

   d. Books, records, receipts, bank statements, money drafts, letters of credit, passbooks, and other documents evidencing the obtaining, transfer, concealment, or expenditure of money.

   e. Any income records documenting receipt, expenditure, or accounting of business or personal funds.

   f. Any forged, fraudulent, or counterfeit documentation used in the scheme, including but not limited to:

      i. Fake IRS Forms 668 D and other tax correspondence

      ii. Lien/levy notices

      iii. Fraudulent settlement agreements and disbursement sheets

      iv. Promissory notes, IOUs, collateral pledges, repayment guarantees

      v. Counterfeit insurance claim checks

      vi. Fake land contracts and real estate purchase agreements

g. IRS-related documents connected to any subject of the investigation.

h. All documents associated with "Efficient Transport Associates," including EIN filings, formation paperwork, ledgers, invoices, client lists, and bank-account opening materials.

i. Notes, journals, victim tracking sheets, scripts or pitches for obtaining money, address books, contact lists, and any documentation reflecting targeting or grooming of elderly or vulnerable individuals.

j. Screenshots, photographs, images, or media sent to victims in furtherance of the scheme.

k. Correspondence related to daily business operations, including notes, emails, memos, letters, and recordings.

l. Books, records, notes, or papers related to the transportation or movement of U.S. currency.

m. Government-issued identification documents, mail, leases, utility bills, access cards, keys, or any items showing ownership, occupancy, or control of property, bank accounts, electronic devices, or cloud accounts.

n. Any indicia of residency or control identifying persons connected to the proceeds of fraud.

o. Player cards, casino membership records, win/loss statements, cage receipts, slot vouchers, redemption tickets, ATM receipts, withdrawal records, or gambling logs reflecting transactions involving victim funds.

p. Photographs or videos depicting any subject or associates in relation to the movement or trafficking of U.S. currency.

q. Bulk currency and/or items related to the acquisition and disposition of the proceeds of the subject offenses.

2. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a. Evidence of who used, owned, or controlled the electronic storage device at the time the things described in this Search and Seizure Warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords,

documents, browsing history, user profiles, email, email contacts, “chat,” instant messaging logs, photographs, and correspondence.

b. Evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c. Evidence of the lack of such malicious software.

d. Evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to the crime under investigation.

e. Evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation including but not limited to knowledge, intent, planning, scheme, and/or motive.

f. Evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence.

g. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device.

h. Evidence of the times the electronic storage device was used.

i. Passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. Documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

k. Contextual information necessary to understand the evidence described herein.

l. Records and things evidencing the use of the Internet Protocol address including:

m. Routers, modems, and network equipment used to connect electronic storage devices to the Internet;

n. Records of Internet Protocol addresses used; and

o. Records of Internet activity, including firewall logs, caches, browser history and cookies, “bookmarked” or “favorite” web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, IRS-CI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

CLERK'S OFFICE
A TRUE COPY
Sep 29, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The premises located at 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202, including any electronic devices located therein, as described in Attachment A

Case No. 26-MJ-528 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18, USC, §§ 371,1343, 1344, 1956, and 1957, and 26 USC §§ 7201 and 7206(1) | Conspiracy, wire fraud, bank fraud, money laundering and money laundering conspiracy, unlawful monetary transactions), evasion of assessment, and false returns |

The application is based on these facts:

See Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Eli Gartner
*Applicant's signature*

Eli Gartner, IRS-CI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 9-29-26

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR CRIMINAL COMPLAINT**

I, Eli Gartner, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI), and have been since February 2023. I have received basic federal law enforcement training, including training at the Federal Law Enforcement Training Center in Glynco, Georgia. During this training I spent approximately 12 weeks learning the basics of federal law enforcement and strategy including but not limited to evidence preservation, interviewing techniques, and firearm proficiency. In the remaining 15 weeks I spent time with an IRS-CI specific training program learning the nuances of financial and tax investigations. My responsibilities as a Special Agent include the investigation of potential criminal violations of the Internal Revenue Code under Title 26 of the United States Code as well as related Title 18 and Title 31 offenses. I have been trained on and have conducted investigations regarding tax fraud, bank fraud, wire fraud, and money laundering. During those investigations, I have used various investigative techniques, including executing search warrants, reviewing physical and electronic evidence, and obtaining and reviewing financial records.

2. The facts in this affidavit come from my personal observations and investigative efforts, my training and experience, and information I have learned from other investigators and witnesses. I believe these sources of information to be credible and reliable.

3. Specifically, I am part of a team of agents and detectives who have been investigating SAVANNAH JUG (09/06/1999), JENNIFER SHIELDS (02/04/1980), JULIE GARDNER (12/26/1962), and DAVID JUAREZ (03/04/1980) for suspected bank fraud, wire fraud, money laundering, and tax crimes. I have been working with IRS-CI Special Agent Jeremy Grobart in this

investigation. I have reviewed SA Grobart's affidavit in support of a search warrant under Case No. 26-MJ-524-SCD, which is attached hereto as Exhibit 1. I believe SA Grobart to be credible and reliable, and I believe his recitation of facts in the search warrant affidavit in Exhibit 1 to be accurate. The facts in SA Grobart's affidavit in Exhibit 1 are incorporated herein by reference.

4. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

**LOCATIONS TO BE SEARCHED**

5. This affidavit is submitted in support of the application for a search warrant for the following residential apartment in the Eastern District of Wisconsin:

   a. The apartment of **SAVANNAH JUG** (09/06/1999) located at 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202, including any cellular devices or computers located therein.

6. Based on the facts disclosed in this affidavit, and SA Grobart's affidavit in Exhibit 1, there is probable cause to believe that located on the premises identified in paragraph 5 of this affidavit are the fruits, evidence, and instrumentalities of criminal offenses in violation of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), and Title 26, United States Code, Sections 7201 (evasion of assessment) and 7206(1) (false returns). The items to be seized are more particularly described in Attachment B.

**PROBABLE CAUSE**

7. In the spring of 2026, the Internal Revenue Service–Criminal Investigation and Waukesha Police Department began investigating JUG, SHIELDS, GARDNER, and JUAREZ after having received reports that they were financially exploiting elderly individuals in the Eastern District of

Wisconsin. Investigators determined that JUG and SHIELDS persuaded victims to give them substantial sums of money under false pretenses, including by claiming that they needed the funds to pay alleged Internal Revenue Service (IRS) tax debts or to invest in a purported (but fictitious) business. Bank records reviewed to date show that approximately $3,500,000 in fraudulent proceeds were transferred from victims' bank accounts into accounts controlled by JUG, SHIELDS, GARDNER (who is SHIELDS's mother), and JUAREZ (who is SHIELDS's romantic partner). This scheme is more fully described in SA Grobart's affidavit, attached hereto as Exhibit 1 and incorporated herein by reference.

8. A criminal complaint and arrest warrant for JUG (DOB: 09/06/1999) was issued on September 25, 2026, by U.S. Magistrate Judge Stephen C. Dries, charging her with violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), under Case No. 26-MJ-523-SCD.

9. A warrant for prospective location information associated with JUG's cellular phone, assigned call number 414-828-4291, was issued on September 27, 2026, under Case No. 26-MJ-526-SCD.

10. Shortly after 6AM this morning, agents, including your affiant, arrested JUG outside of the Yankee Hill apartment complex located at 626 East State Street, Milwaukee, Wisconsin 53202. Agents observed JUG, in a vehicle, exit the building's parking lot and park immediately nearby on North Van Buren Street. She then exited her car, and agents approached and arrested her.

11. JUG was searched incident to arrest; agents did not locate an electronic device on her person. Agents asked JUG if she had a cellular phone, and JUG responded affirmatively, indicating it was inside her apartment. JUG told agents her apartment is Apartment 508, and she resides there

alone with her cats. JUG initially agreed to go to the apartment, accompanied by agents, to retrieve her phone. However, shortly before reaching the main door to the apartment complex, JUG changed her mind. Agents indicated they would obtain a search warrant for her apartment to retrieve the phone if she did not give it to them voluntarily; JUG did not consent. JUG did confirm at that point that her phone was inside the apartment, on the couch.

12. Agents actively monitored the phone's location information this morning, collected pursuant to the ping warrant described above. At 7:33AM, the location data indicated JUG's device with phone number 414-828-4291 was within 165 meters of the Yankee Hill apartment complex. At 7:48AM, the device was within 272 meters of the apartment complex.

13. Around 8:15AM this morning, another agent working on this investigation, IRS-CI SA Ashley Bradaric, spoke with a representative of the Yankee Hill apartment complex, who confirmed that JUG is the tenant of Apartment 508 at Yankee Hill. According to that representative, JUG is the only person on the lease for that apartment, and she started her lease on June 20, 2026.

14. Based on my training and experience, I know that individuals involved in both legal and illegal financial activities maintain books and records of some kind. These records include notebooks, billing records, payment ledgers, bank statements, communications, and records showing the receipt and disposition of funds. Records of this type are normally kept for extended periods of time, are portable, and routinely stored in places that are secure but easily accessible, such as the individual's residence.

15. I also know, from having reviewed SA Grobart's affidavit in Exhibit 1, which I believe to be accurate and reliable, that JUG has used electronic devices to communicate with victims to advance her criminal conspiracy.

## COMPUTERS, CELLPHONES, ELECTRONIC STORAGE, FORENSIC ANALYSIS

16. As described above, and in Exhibit 1, and in Attachment B, this application seeks permission to search for evidence that might be found at JUG's residence, in whatever form is it found. One form in which the evidence might be found is data stored on a computer's hard drive, cellphone, or other storage media. Thus, the warrant for which I am applying would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

17. *Probable cause*. I submit that if a computer, cellphone, or storage medium is found at 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

18. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202, because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti- virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information

stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement)

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

19. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a warrant location for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the warrant location, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a

complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time at the site of the warrant could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the warrant location. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

20. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

21. Although it is my understanding that JUG resides at 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202 alone, it is possible that the residence will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**BIOMETIC UNLOCK**

22. The warrant I am applying for would permit law enforcement to obtain from SAVANNAH JUG the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following.

23. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

24. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the

bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

25. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

26. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

27. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur

when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

28. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of SAVANNAH JUG to the fingerprint scanner of the device; and/or (2) hold the device in front of the face of SAVANNAH JUG and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **CONCULSION**

29. Based on the foregoing, including the facts articulated by SA Grobart in the affidavit attached hereto as Exhibit 1, there is probable cause to believe evidence of violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), and Title 26, United States Code, Sections 7201 (evasion of assessment) and 7206(1) (false returns), will be found at 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202.

30. I respectfully request a search warrant to be authorized for the search of 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202, including on-site storage units to which JUG

would have access, to recover and seize evidence described in Attachment B, in any form, including on any cellular phone or electronic device.

**ATTACHMENT A**

*Property to Be Searched*

The residence located at 626 East State Street, Apartment 508, Milwaukee, Wisconsin 53202, including any cellular devices or computers located on-site, and including any storage units on-site to which SAVANAH JUG has access.

## ATTACHMENT B

*Items to be Seized*

1. All records relating to violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), and Title 26, United States Code, Sections 7201 (evasion of assessment) and 7206(1) (false returns), those violations involving Savannah Jug, Jennifer Shields, David Juarez, and/or Julie Gardner, and others known and unknown, since January 1, 2022, including but not limited to:

   a. Banking records for any account used by or associated with the subjects or entities involved in the scheme, including account statements, checks, wire/ACH documentation, cashier's checks, money orders, deposit/withdrawal slips, loan documents, balance notes, and related financial materials.

   b. Documents showing the receipt, movement, concealment, transfer, or expenditure of funds, including ledgers, notebooks, spreadsheets, handwritten notes, receipts, and records of Apple Cash, CashApp, Zelle, Venmo, or similar payment platforms.

   c. Records relating to the financing or purchase of vehicles or real estate properties.

   d. Books, records, receipts, bank statements, money drafts, letters of credit, passbooks, and other documents evidencing the obtaining, transfer, concealment, or expenditure of money.

   e. Any income records documenting receipt, expenditure, or accounting of business or personal funds.

   f. Any forged, fraudulent, or counterfeit documentation used in the scheme, including but not limited to:

      i. Fake IRS Forms 668 D and other tax correspondence

      ii. Lien/levy notices

      iii. Fraudulent settlement agreements and disbursement sheets

      iv. Promissory notes, IOUs, collateral pledges, repayment guarantees

      v. Counterfeit insurance claim checks

      vi. Fake land contracts and real estate purchase agreements

g. IRS-related documents connected to any subject of the investigation.

h. All documents associated with "Efficient Transport Associates," including EIN filings, formation paperwork, ledgers, invoices, client lists, and bank-account opening materials.

i. Notes, journals, victim tracking sheets, scripts or pitches for obtaining money, address books, contact lists, and any documentation reflecting targeting or grooming of elderly or vulnerable individuals.

j. Screenshots, photographs, images, or media sent to victims in furtherance of the scheme.

k. Correspondence related to daily business operations, including notes, emails, memos, letters, and recordings.

l. Books, records, notes, or papers related to the transportation or movement of U.S. currency.

m. Government-issued identification documents, mail, leases, utility bills, access cards, keys, or any items showing ownership, occupancy, or control of property, bank accounts, electronic devices, or cloud accounts.

n. Any indicia of residency or control identifying persons connected to the proceeds of fraud.

o. Player cards, casino membership records, win/loss statements, cage receipts, slot vouchers, redemption tickets, ATM receipts, withdrawal records, or gambling logs reflecting transactions involving victim funds.

p. Photographs or videos depicting any subject or associates in relation to the movement or trafficking of U.S. currency.

q. Bulk currency and/or items related to the acquisition and disposition of the proceeds of the subject offenses.

2. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a. Evidence of who used, owned, or controlled the electronic storage device at the time the things described in this Search and Seizure Warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords,

documents, browsing history, user profiles, email, email contacts, “chat,” instant messaging logs, photographs, and correspondence.

b. Evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c. Evidence of the lack of such malicious software.

d. Evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to the crime under investigation.

e. Evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation including but not limited to knowledge, intent, planning, scheme, and/or motive.

f. Evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence.

g. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device.

h. Evidence of the times the electronic storage device was used.

i. Passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. Documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

k. Contextual information necessary to understand the evidence described herein.

l. Records and things evidencing the use of the Internet Protocol address including:

m. Routers, modems, and network equipment used to connect electronic storage devices to the Internet;

n. Records of Internet Protocol addresses used; and

o. Records of Internet activity, including firewall logs, caches, browser history and cookies, “bookmarked” or “favorite” web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, IRS-CI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

EXHIBIT 1

 ❒ Original ❒ D

CLERK'S OFFICE
A TRUE COPY
Sep 25, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
The premises at 1442 Big Bend Road, Unit D, Waukesha, WI and 201 Estberg Avenue, Waukesha, WI 53186, and the persons of JUG, SHIELDS, GARDNER, and JUAREZ, as described in Attachment A

Case No. 26-MJ-524 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before October 9, 2026 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ________ .

Date and time issued: 9-25-26. 3:00 pm

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

# EXHIBIT 1



**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

_______________________________________
*Executing officer's signature*

_______________________________________
*Printed name and title*

**EXHIBIT 1**

## ATTACHMENT A

*Persons and Property to Be Searched*

1. The person and effects of SAVANNAH JUG (09/06/1999)

2. The person and effects of JENNIFER SHIELDS (02/04/1980)

3. The person and effects of DAVID JUAREZ (03/04/1980)

4. The person and effects of JULIE GARDNER (12/26/1962)

5. The residence located at 1442 Big Bend Rd, Unit D, Waukesha WI 53189, including any cellular devices or computers located on-site, and including any of the following vehicles, if present on-site in the building's parking lot:

    a. White 2021 Chevrolet Silverado- Crew Pickup, Wisconsin License Plate: WP2555, VIN: 1GCUYEET5MZ192060

    b. White 2018 Land Rover Discovery SUV, Wisconsin License Plate BAL-9687, VIN: SALRR2RV7JA069425

    c. Gray 2025 Chevy Trax SUV, Wisconsin License Plate ATD-9053, VIN: KL77LKEP8SC222176

This residence is a multi-unit apartment building constructed with brown brick and gray paneling. A parking lot is located on the south side of the building. The address "1442" is displayed at the top center of the structure. Unit "D" is marked in large lettering beneath an exterior window situated in the center of the building facing the parking lot. A sidewalk extends from the parking lot to the light-colored entry door of Unit "D."



**EXHIBIT 1**

6. The residence located at 201 Estberg Ave, Waukesha, WI 53186, including any cellular devices or computers located on-site, including any garage or outbuilding on-site, and including the following vehicle, if present on-site:

   a. White 2011 Ford Fiesta, Wisconsin License Plate: AET-4373, VIN: 3FADH4BJ1BM109082

   This residence is a house with blue siding. The detached garage is located south of the house and is gray in color, with the garage door facing east. A concrete driveway off Garfield Avenue provides access to the garage. From Estberg Avenue, a concrete walkway leads up to the steps of the house.





**EXHIBIT 1**

## ATTACHMENT B

*Items to be Seized*

1. All records relating to violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), and Title 26, United States Code, Sections 7201 (evasion of assessment) and 7206(1) (false returns), those violations involving Savannah Jug, Jennifer Shields, David Juarez, and/or Julie Gardner, and others known and unknown, since January 1, 2022, including but not limited to:

   a. Banking records for any account used by or associated with the subjects or entities involved in the scheme, including account statements, checks, wire/ACH documentation, cashier's checks, money orders, deposit/withdrawal slips, loan documents, balance notes, and related financial materials.

   b. Documents showing the receipt, movement, concealment, transfer, or expenditure of funds, including ledgers, notebooks, spreadsheets, handwritten notes, receipts, and records of Apple Cash, CashApp, Zelle, Venmo, or similar payment platforms.

   c. Records relating to the financing or purchase of vehicles or real estate properties.

   d. Books, records, receipts, bank statements, money drafts, letters of credit, passbooks, and other documents evidencing the obtaining, transfer, concealment, or expenditure of money.

   e. Any income records documenting receipt, expenditure, or accounting of business or personal funds.

   f. Any forged, fraudulent, or counterfeit documentation used in the scheme, including but not limited to:

      i. Fake IRS Forms 668 D and other tax correspondence

      ii. Lien/levy notices

      iii. Fraudulent settlement agreements and disbursement sheets

      iv. Promissory notes, IOUs, collateral pledges, repayment guarantees

      v. Counterfeit insurance claim checks

      vi. Fake land contracts and real estate purchase agreements

g. IRS-related documents connected to any subject of the investigation.

h. All documents associated with "Efficient Transport Associates," including EIN filings, formation paperwork, ledgers, invoices, client lists, and bank-account opening materials.

i. Notes, journals, victim tracking sheets, scripts or pitches for obtaining money, address books, contact lists, and any documentation reflecting targeting or grooming of elderly or vulnerable individuals.

j. Screenshots, photographs, images, or media sent to victims in furtherance of the scheme.

k. Correspondence related to daily business operations, including notes, emails, memos, letters, and recordings.

l. Books, records, notes, or papers related to the transportation or movement of U.S. currency.

m. Government-issued identification documents, mail, leases, utility bills, access cards, keys, or any items showing ownership, occupancy, or control of property, bank accounts, electronic devices, or cloud accounts.

n. Any indicia of residency or control identifying persons connected to the proceeds of fraud.

o. Player cards, casino membership records, win/loss statements, cage receipts, slot vouchers, redemption tickets, ATM receipts, withdrawal records, or gambling logs reflecting transactions involving victim funds.

p. Photographs or videos depicting any subject or associates in relation to the movement or trafficking of U.S. currency.

q. Bulk currency and/or items related to the acquisition and disposition of the proceeds of the subject offenses.

2. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a. Evidence of who used, owned, or controlled the electronic storage device at the time the things described in this Search and Seizure Warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords,

documents, browsing history, user profiles, email, email contacts, “chat,” instant messaging logs, photographs, and correspondence.

b. Evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c. Evidence of the lack of such malicious software.

d. Evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to the crime under investigation.

e. Evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation including but not limited to knowledge, intent, planning, scheme, and/or motive.

f. Evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence.

g. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device.

h. Evidence of the times the electronic storage device was used.

i. Passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. Documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

k. Contextual information necessary to understand the evidence described herein.

l. Records and things evidencing the use of the Internet Protocol address including:

m. Routers, modems, and network equipment used to connect electronic storage devices to the Internet;

n. Records of Internet Protocol addresses used; and

o. Records of Internet activity, including firewall logs, caches, browser history and cookies, “bookmarked” or “favorite” web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**EXHIBIT 1**

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, IRS-CI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

CLERK'S OFFICE
A TRUE COPY
Sep 25, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The premises at 1442 Big Bend Road, Unit D, Waukesha, WI and 201 Estberg Avenue, Waukesha, WI 53186, and the persons of JUG, SHIELDS, GARDNER, and JUAREZ, as described in Attachment A

Case No. 26-MJ-524 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18, USC, §§ 371,1343, 1344, 1956, and 1957, and 26 USC §§ 7201 and 7206(1) | Conspiracy, wire fraud, bank fraud, money laundering and money laundering conspiracy, unlawful monetary transactions), evasion of assessment, and false returns |

The application is based on these facts:

See Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ______ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Jeremy Grobart, IRS-CI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 9-25-26

[signature]
*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**EXHIBIT 1**

**AFFIDAVIT IN SUPPORT OF**
**<u>APPLICATION FOR CRIMINAL COMPLAINT</u>**

I, Jeremy J. Grobart, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1. I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service (IRS-CI), United States Department of the Treasury, and have been since July of 2021. Prior to that, I was employed as a Police Officer with the City of Madison, Wisconsin. I received a Masters in Business Administration, with a concentration in Data Analytics, from Loyola University Chicago. I have conducted numerous investigations involving violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title 31, United States Code), and other related offenses. I have been the affiant on numerous warrants, including having participated in the execution of numerous warrants. I have completed the Criminal Investigator Training Program and the Special Agent Investigative Techniques Program at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received extensive training on financial investigative techniques.

2. Based on my training and experience, I know that individuals involved in both legal and illegal financial activities maintain books and records of some kind. These records include notebooks, billing records, payment ledgers, bank statements, communications, and records showing the receipt and disposition of funds. Records of this type are normally kept for extended periods of time, are portable, and routinely stored in places that are secure but easily accessible, such as the individual's residence.

3. The facts in this affidavit come from my personal observations, my training and experience, information obtained from other Investigators and witnesses, public records, and my own investigative efforts. I believe these sources of information to be credible and reliable based on the

corroboration of the information and my experience with these matters. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## LOCATIONS TO BE SEARCHED

4. This affidavit is submitted in support of the application for a search warrant for the locations listed below in the Eastern District of Wisconsin. These locations are more particularly described in Attachment A.

   a. The person and effects of **SAVANNAH JUG** (09/06/1999)

   b. The person and effects of **JENNIFER SHIELDS** (02/04/1980)

   c. The person and effects of **JULIE GARDNER** (12/26/1962)

   d. The person and effects of **DAVID JUAREZ** (03/04/1980)

   e. The residence of David Juarez, Jennifer Shields, and Savannah Jug, located at **1442 Big Bend Road, Unit D, Waukesha, WI 53189**, including any cellular devices or computers located on-site, and including any of the following target vehicles, if present on-site in the building's parking lot:

      i. White 2021 Chevrolet Silverado- Crew Pickup, Wisconsin License Plate: WP2555, VIN: 1GCUYEET5MZ192060

      ii. White 2018 Land Rover Discovery SUV, Wisconsin License Plate BAL-9687, VIN: SALRR2RV7JA069425

      iii. Gray 2025 Chevy Trax SUV, Wisconsin License Plate ATD-9053, VIN: KL77LKEP8SC222176

   f. The residence of Julie Gardner, located at **201 Estberg Avenue, Waukesha, WI 53186,** including any cellular devices or computers located on-site, including any

garage or outbuilding on-site, and including the following target vehicle, if present on-site:

i. White 2011 Ford Fiesta, Wisconsin License Plate: AET-4373, VIN: 3FADH4BJ1BM109082

5. Based on the facts disclosed in this affidavit, there is probable cause to believe that located on the persons and at the premises identified in paragraph 4 of this affidavit are the fruits, evidence, and instrumentalities of criminal offenses in violation of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), and Title 26, United States Code, Sections 7201 (evasion of assessment) and 7206(1) (false returns). The items to be seized are more particularly described in Attachment B.

## PROBABLE CAUSE

### *Investigation Background*

6. In the spring of 2026, the Internal Revenue Service–Criminal Investigation and Waukesha Police Department began investigating JUG, SHIELDS, GARDNER, and JUAREZ after having received reports that they were financially exploiting elderly individuals in the Eastern District of Wisconsin. Investigators determined that JUG and SHIELDS persuaded victims to give them substantial sums of money under false pretenses, including by claiming that they needed the funds to pay alleged Internal Revenue Service (IRS) tax debts or to invest in a purported (but fictitious) business. Bank records reviewed to date show that approximately $3,500,000 in fraudulent proceeds were transferred from victims' bank accounts into accounts controlled by JUG,

SHIELDS, GARDNER (who is SHIELDS's mother), and JUAREZ (who is SHIELDS's romantic partner).[1]

***Victim A***

7. Victim A's wife died from COVID-related complications in 2022. Following her death, and due to Victim A's declining health, his former pastor, G.L., became his financial power of attorney. In the summer of 2025, Victim A met and befriended JUG, who shortly thereafter told Victim A that she owed the IRS $63,000 in unpaid taxes. Victim A told investigators that he agreed to give JUG $63,000 to pay her supposed tax debt, and he accompanied JUG to a BMO Bank location to obtain a cashier's check for that amount. Victim A said BMO employees warned him that if the funds were genuinely intended for tax debt, the cashier's check should be made payable to the Internal Revenue Service rather than to JUG. Despite the bank employees' attempts to dissuade Victim A, he obtained a cashier's check payable to JUG. Investigators later located the check deposited in JUG's bank account and confirmed that none of the funds were used for IRS-related expenses.

8. Investigators have confirmed that neither JUG nor SHIELDS (as explained further below) have or had outstanding tax debt owed to the IRS during any point relevant to the timeframe of the scheme described herein, including in 2025 or 2026. As to state tax debt, an agent with the Wisconsin Department of Revenue told investigators that JUG owes a small amount of tax debt ($159) but that no active collection efforts have been made to collect on that debt. The agent said that SHIELDS owed approximately $59,000 in back taxes in or around 2016, and that the state sent letters to SHIELDS through April 2023 seeking to collect that debt, but there have been no

[1] The banks and credit unions referenced in this affidavit were, at all relevant times, federally insured.

active collection efforts since then. The agent confirmed neither JUG nor SHIELDS paid the Wisconsin Department of Revenue the back taxes they owed.

9. A few months later, in December 2025, JUG presented Victim A with a promissory note purportedly memorializing her promise to repay him. The note listed two different repayment amounts—$150,000 and $160,000. JUG attached to the note a purported "Settlement and Release Agreement" between her and "Aurora Hospital," which purported to show that "Aurora Hospital" agreed to pay JUG $192,076.30 to settle a lawsuit that JUG had filed. That settlement agreement displayed several indicators that it was fraudulent, including that "Aurora Hospital" is not a real entity, the document did not list a court where the purported lawsuit was filed, the case number of the purported lawsuit ("2025-NX-01") is not consistent with case numbering from any court in Wisconsin, and the names of her purported lawyers do not correspond to actual attorneys in Wisconsin. Victim A told investigators that JUG claimed she would repay Victim A with the money she was owed from the purported Aurora Hospital settlement. Victim A accepted the promissory note as an assurance that JUG would repay him.

10. In March 2026, JUG introduced Victim A to SHIELDS, whom she falsely described as her aunt. In fact, SHIELDS is the mother of JUG's children's father. JUG and SHIELDS told Victim A that they intended to purchase an Amazon subcontracting delivery business supposedly owned by JUAREZ, and they asked Victim A for his financial assistance to purchase the business. JUAREZ is actually SHIELDS's romantic partner, with whom she lives, and he does not (and did not in early 2026) own a transportation business. JUG and SHIELDS told Victim A that JUAREZ's business was called "JJJ" or "3J's"; no such business has been incorporated in Wisconsin.

11. Victim A agreed to assist in purchasing the non-existent transportation business. He gave JUG and SHIELDS a signed blank check with the intention that they could use it to purchase a

sprinter delivery van for business operations. SHIELDS later sent Victim A, via text message, an image of a partial license plate, claiming it belonged to the delivery van that she and JUG purchased with Victim A's funds. However, law enforcement records show the license plate was registered to a Chevy Silverado pickup truck with VIN 1GCUYEET5MZ192060 that had been recently purchased by JUAREZ. Investigators later determined that Victim A's check had been written out to JUAREZ; specifically, Landmark Credit Union records show check #153, drawn from Victim 1's account x2421, was issued to JUAREZ for $46,000. The memo line on the check reads "van purchase." Although the check bears Victim 1's signature, the remaining handwriting on the check does not match Victim 1's handwriting. JUAREZ used part of the funds to purchase the Chevrolet Silverado for his own personal use, not a delivery van for any legitimate business. The Chevrolet Silverado is registered to the shared residence of SHIELDS and JUAREZ at **1442 Big Bend Road, Unit D, Waukesha, WI 53189**.

12. Victim A was unaware of this and continued providing money to JUG and SHIELDS to purchase the "business" from JUAREZ. JUG and SHIELDS told Victim A that the purchase price for the supposed transportation business was $220,000. Victim A agreed to provide them with that amount, for that purpose.

13. On April 4, 2026, Victim A deposited $220,000 into a joint UW Credit Union account (x8201) he shared with JUG. Two days later, JUG transferred $210,000 into her personal UWCU account (x8701) and then wired $110,000 to JUAREZ's personal Wells Fargo checking account (x4270). After the transfer, UWCU requested Wells Fargo return the funds due to suspected fraud. On May 21, 2026, UWCU received $108,500 back from Wells Fargo and issued it via cashier's check to Victim A, who then immediately deposited it into a new US Bank account. On June 2, 2026, Victim A withdrew $109,000 from that US Bank account, in the form of two cashier's

checks—one payable to DAVID JUAREZ for $55,000 (memo: land rent) and the other payable to SAVANNAH JUG for $54,000 (memo: property). That same day, SHIELDS texted Victim A: "Cashier's check one is made out to JUG in the amount of $54,000 for land rent. Cashier's check number two is made out to JUAREZ in the amount of $55,000 for farming equipment." Victim A told investigators the purpose of the false memo lines was to deceive the bank about the checks' true purpose, so that bank was less likely to flag or freeze them.

14. In July 2026, Victim A confronted SHIELDS about having provided approximately $800,000 to JUG and SHIELDS without receiving any repayment. SHIELDS told Victim A that she was unable to pay him back because her accounts supposedly had liens on them, preventing her from accessing funds in the accounts, due to IRS tax warrants totaling $365,000. SHIELDS also told Victim A that she needed additional money to pay off this purported IRS debt so that she could sell a bar she claimed to own for $850,000, and then use the proceeds to repay Victim A. Investigators did not locate any evidence suggesting SHIELDS actually owns or owned a bar.

15. SHIELDS then provided Victim A with two purported insurance-claim checks, made out to her and JUG, from Farmers Insurance as "collateral" for the debt she owed to him. These checks appeared legitimate to Victim A and were intended to convince him that SHIELDS and JUG had the ability to repay him once their accounts were "unfrozen." The checks indicated they were drawn on Summit Credit Union. Both Summit Credit Union and Farmers Insurance confirmed to investigators that the checks were not legitimate.

16. On the morning of July 21, 2026, SHIELDS went to Victim A's residence and attempted to have Victim A apply for a $350,000 home equity line of credit (HELOC) loan through US Bank so she could use the funds to pay off her supposed tax debt. SHIELDS assisted Victim A in creating an online account, and calling a banker regarding the loan, telling Victim A that the process would

be "very easy." Investigators later reviewed text messages between JUG, SHIELDS, and Victim A, which showed that SHIELDS had texted Victim A the username and password information for the HELOC application.

17. Bank records reviewed by investigators thus far show approximately $470,000 provided by Victim A to JUG, JUAREZ, GARDNER, and SHIELDS between August 7, 2025, and May 6, 2026.

***Victim A Text Messages***

18. Victim A consented to investigators downloading the contents of his cell phone and reviewing its contents, including communications between him, JUG, and SHIELDS. These text messages show that SHIELDS repeatedly pressured Victim A into transmitting large sums of money, based on fabricated IRS emergencies, fictitious business opportunities, and false promises of repayment.

19. For example, on March 12, 2026, SHIELDS wrote, "I just wanted to text you back and say I'm literally begging you to please do this for her [JUG]. You can trust me to pay every dime back and we can open you a new IRA. I only need 2 to 3 weeks to pay you back. I will pay all penalties and taxes. I will not let you down. I am a good honest person. I've never borrowed money from anybody. I'm only doing this for [JUG] and the kids. Please help me. I don't have anybody else and I promise I will help find a new IRA to put all the money back in when I pay you back." She continued reinforcing nonexistent IRS crises, telling Victim A on April 23, 2026, "I can't think clear with all this shit going on with [JUG] and the IRS and the bank."

20. On June 25, 2026, SHIELDS texted Victim A, in an effort to convince him that she had assets with which she could repay him, "I have millions of dollars and assets and I can't even get my hands on $1,000 right now."

21. Possibly having learned that investigators had interviewed Victim A, SHIELDS texted him the morning of his planned meeting at the Waukesha Police Department (July 21, 2026), continuing her fabricated tax-warrant narrative, stating, "You know the money that you were gonna borrow to me was for the tax warrant, for my tax warrant that I have online, so we could start the business."[2]

22. Victim A's text messages to SHIELDS show his reliance on the misrepresentations made to him by JUG and SHIELDS. For example, on March 9, 2026, he texted, "Hey Jen, where are you, I am waiting to hear from you. I would like to help [JUG] and see the van and the business. I have time today. Please get back to me soon, so we can get something done." A few days later, on March 16, 2026, Victim A again texted SHIELDS, stating, "How is the bail money coming. I talked to another agent and maybe I could help with some money. Everybody forgets I help her with 225,000 and a whole lot more. I only have so much money to work with. I am not a rich man but I am a man with a heart."

***Victim B***

23. Victim B met JUG at Heartbreakers Strip Club in November 2022, where JUG works. Approximately one month later, JUG introduced Victim B to SHIELDS. Victim B recalled having previously visited SHIELDS's residence at **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189**. Soon after meeting JUG and SHIELDS, both JUG and SHIELDS began soliciting money from Victim B under false pretenses.

---

[2] Wisconsin Consolidated Court Automation Program (CCAP) records show that SHIELDS has three outstanding state tax warrants in Waukesha County, under case numbers 2018TW000252, 2019TW000287, and 2020TW000299, totaling $30,322.31 owed to the Wisconsin Department of Revenue. However, as described above, a special agent with the Wisconsin Department of Revenue informed investigators that, despite these warrants, there were and are no liens, levies, or active collection efforts on any bank accounts belonging to SHIELDS, JUG, GARDNER, or JUAREZ, contrary to the representations made to victims.

24. For example, SHIELDS told Victim B she owed $70,000 in back taxes. Believing she would repay him, Victim B told investigators that he took a loan from his 401(k) and provided a check to JUG for SHIELDS's supposed tax debt.

25. Shortly after this, SHIELDS told Victim B that she owed an additional $60,000. She claimed this was due to her ex-husband having placed business equipment in her name, making her liable for the taxes. Because Victim B could not take more than one loan from his retirement account at a time, SHIELDS helped Victim B fabricate an exigency that would allow him to take out more money. Specifically, SHIELDS created, or had someone else create, two false repair estimates for storm damage that supposedly occurred to Victim B's home. Victim B then provided those estimates to Victim B's retirement plan, by mail, to justify withdrawal under purported exigent circumstances. No actual storm damage had occurred, but the fabricated reports resulted in Victim B taking additional withdrawals for SHIELDS to pay her fictitious IRS debt.

26. Records from Victim B's T-Rowe Price Retirement account show withdrawals consistent with what Victim B told investigators, including a 02/17/2023 withdrawal of $27,760.42 (before taxes), a 03/22/2023 withdrawal of $79,000.00, and a 04/10/2023 withdrawal of $46,500.00. Approximately one week after that last withdrawal, of $46,500, was deposited into Victim B's account, a cashier's check was issued from that account to JUG for $43,000.

27. Around March 2023, Victim B also obtained an $80,000 HELOC loan at JUG's and SHIELDS's insistence, believing the proceeds were needed to satisfy SHIELDS's additional tax liabilities.

28. Investigators showed Victim B an image of a $77,000 cashier's check he drew from his BMO Bank account on March 25, 2024, made payable to Austin Shields, SHIELDS's son (and the father of JUG's children). Victim B stated that SHIELDS directed him to write the check to Austin

Shields so it would avoid bank scrutiny, particularly because BMO had already warned him he was being scammed.

29. In mid-2024, JUG told Victim B that SHIELDS was incarcerated for unpaid taxes. Victim B reported that there were periods when SHIELDS was supposedly released and communicated with him, only to later be "picked up" again by law enforcement for continued tax delinquency. Victim B was told that SHIELDS and JUG were being held in jails located in Waukesha County, Dane County, and another unidentified county in northern Wisconsin. During these periods of alleged incarceration, Victim B was told that GARDNER and JUG remained in communication with SHIELDS.

30. Victim B recalled an incident in which he traveled to Waukesha Memorial Hospital, where he met SHIELDS's daughter, "Angel," in the parking lot. During this encounter, Victim B provided Angel with money that he believed was intended to be used as bail funds for both JUG and SHIELDS, who he had been told were incarcerated for unpaid IRS tax balances. To reinforce this claim, SHIELDS sent Victim B photographs of receipts purporting to be from the IRS and jail facilities (but which were false), attempting to convince him that the funds were being used for bail associated with tax-related offenses.

31. SHIELDS and JUG continued soliciting money from Victim B through 2026. Victim B estimates that he has provided more than $1,000,000 to JUG and SHIELDS, some of which was paid directly to JUAREZ. As a result of the fraud, Victim B depleted his retirement account, lost his home and motorcycle, and ultimately filed for bankruptcy. Victim B told investigators that he who now donates plasma "just to survive." He told investigators he has received no repayment from SHIELDS, JUG, JUAREZ, or GARDNER.

32. Bank records reviewed by investigators thus far have identified approximately $420,000 provided by Victim B to JUG, JUAREZ, GARDNER, and SHIELDS between August 25, 2023, and July 19, 2024.

***Victim B Text Messages***

33. On August 4, 2026, Victim B consented to investigators downloading the contents of his cell phone and reviewing its contents, including communications between him, SHIELDS, and JUG. As with Victim A, these text messages show SHIELDS and JUG using electronic communications to solicit large sums of money from Victim B by fabricating IRS emergencies, falsely claiming frozen bank accounts, and pressuring him to take out additional loans.

34. For example, on March 7, 2023, SHIELDS sent Victim B a photo of a purported $269,254 US Bank check, allegedly from the sale of a condo she owned, boasting, "now I only have two condos left. I'm a little sad." A few days later, on March 14, 2023, SHIELDS texted Victim B about this same check, stating, "My checks are still not cleared. I just checked the bank. My available balance is $123.33 and my ledger balance says $704,378.24. It looks so nice on there. I think that's the most I've ever had lol." Investigators believe SHIELDS sent Victim B a false check image (similar to images she sent to Victim A and later Victim D) to make him believe she had funds to repay him.

35. On March 16, 2023, SHIELDS told Victim B, "I have a bunch of bills I have to pay. The IRS is sending me threatening letters because I borrowed Savannah all that money in the beginning of the year. They're threatening me for my business taxes. I owe them $77,000. I need to take care of that on Friday so I just have a lot of stuff to do." A week later, on March 24, 2023, SHIELDS insisted on receiving the entire $77,000, telling Victim B, "If you could do the whole $77,000 that would be great. I did call and if I give them a cashier's check it'll take 10 days to clear before they

can post it to my account. If we pay them in cash it'll be released immediately. I can't pay any debit cards or personal checks because my account is froze."

36. On March 28, 2023, Victim B asked SHIELDS for a receipt confirming that the $77,000 was used to pay the IRS. SHIELDS then sent Victim B a fictitious IRS form titled "668-D Release of Levy/Release of Property Levy" to make him believe the payment had been made. The $77,000 referenced in these communications was the same cashier's check that Victim B wrote to "Austin Shields," about which investigators later questioned Victim B.

37. Like SHIELDS, JUG also reinforced the scheme with her own communications to Victim B. For example, on February 26, 2024, JUG urged Victim B to liquidate his retirement account, telling him, "You mine as well take that money out of your 401k and seriously just put it back when you get your money back." A few days later, on February 29, 2024, JUG sent Victim B a picture of a computer screen showing her attempting to open a new bank account for him. Accompanying the photo, JUG wrote, "Either way, if you don't help with the house, or you do, you need another bank account because Landmark was asking you questions before. So I don't want anything happening and so I was going to open a new bank account online for you."

***Victim C***

38. Victim C is an elderly individual with chronic leukemia. His wife suffers from severe dementia, and their shared daughter retains temporary guardianship over her. Several years before meeting JUG, Victim C moved out of his marital residence (where his wife continues to reside) and began renting a duplex unit down the street.

39. In October 2023, Victim C met JUG at Heartbreakers Strip Club, and JUG introduced him to SHIELDS. Soon afterward, according to Victim C's children, Victim C began withdrawing

unusually large amounts of cash, opening credit cards (through online applications) for JUG and SHIELDS, and paying off substantial balances that they ran up.

40. In late 2023, according to Victim C and his children, JUG told Victim C she needed help purchasing a residence at 2148 S. 91st Street in West Allis, Wisconsin. JUG falsely claimed that GARDNER owned the home and would be selling it to her. Handwritten notes, which Victim C's daughter found at Victim C's residence, document that Victim C paid $154,000 from his Chase Bank account for 2148 S. 91st Street. Bank records show that Victim C provided GARDNER with a $154,000 check for the supposed purchase. Additional bank records, discussed below, show that GARDNER also received additional wire transfers and deposits from Victim C.

41. Real-estate records reviewed by investigators confirm that 2148 S. 91st Street was owned by Big Fish Investments LLC. The owner of Big Fish Investments LLC confirmed that SHIELDS, JUG, and GARDNER never owned the property. He said JUG had been a tenant at the time she told Victim C that she was purchasing the property. He did not even know SHIELDS or GARDNER.

42. JUG and SHIELDS also provided false "collateral" to Victim C in the form of two fictitious checks from "JD Investment" totaling approximately $530,000. They told Victim C that the checks represented land-sale proceeds that they were owed, but that they could not access due to IRS liens on their accounts.

43. On June 12, 2025, West Allis Police Department detectives interviewed SHIELDS at **1442 Big Bend Road, Unit D, Waukesha, WI 53189**. SHIELDS told detectives that she and JUG met Victim C at Heartbreakers Strip Club in West Allis and later began cleaning his residence. SHIELDS said that Victim C frequently asked her to cash checks for him because his family was no longer giving him money, falsely explaining that JUG was helping care for Victim C's wife,

who suffered from dementia. SHIELDS denied involvement in any scheme to purchase a residence at 2148 S. 91st Street. She asserted she never received money from JUG, never used Victim C's credit cards, and denied ever providing Victim C with collateral checks. She also denied ever being jailed for IRS issues—contrary to what Victim C, and the other victims, had been led to believe.

44. On January 22, 2026, West Allis Police Department detectives spoke with GARDNER at her residence located at **201 Estberg Avenue, Waukesha, Wisconsin 53186**. GARDNER initially denied cashing checks for Victim C. She stated she had never been to Victim C's home and claimed that although SHIELDS once gave her a check to deposit, she did not remember the payee, amount, or whether she kept any portion of the money. GARDNER described herself as vague on financial details, stating her Chase Bank account was later closed for reasons unknown to her. GARDNER said she believed Victim C was "a nice guy" who freely gave money to JUG and other women; she denied ever discussing property purchases, tax issues, or receiving wire transfers from JUG.

45. Bank records reviewed by investigators show that Victim C provided approximately $539,973.00 to JUG, GARDNER, JUAREZ, and SHIELDS between September 5, 2023, and December 18, 2024.

***Victim D***

46. Victim D told investigators that he has given more than $2,000,000 to JUAREZ and SHIELDS. Victim D, who had diligently saved for his retirement by working for decades in construction, explained that he believed he was loaning SHIELDS money, through her purported attorney, JUAREZ, so that SHIELDS could pay off her supposed IRS tax debt.

47. Victim D met SHIELDS in late 2024 at a Waukesha bowling alley, and the two began dating. In early 2025, SHIELDS told Victim D she was receiving IRS levy notices stemming from supposed business tax liabilities incurred by her ex-husband. Based on those claims, and fraudulent

IRS documents that SHIELDS repeatedly presented to him, Victim D wrote large checks on SHIELDS's behalf, intended for the IRS, but directed to her supposed attorney, JUAREZ, at SHIELDS's request. Victim D told investigators that he believed the tax debt was legitimate, particularly because SHIELDS's mother, GARDNER, reinforced the deception, assuring him that the tax liabilities were real. GARDNER also told Victim D that JUAREZ was a licensed attorney whose office was next to a building she cleaned in Brookfield, Wisconsin. Investigators confirmed through the Wisconsin Bar registry and employment records that JUAREZ is not a licensed attorney.

48. Throughout 2025, SHIELDS told Victim D that she had attended (nonexistent) "IRS hearings," which allegedly resulted in her supposed tax liabilities suddenly increasing, prompting her to continue to solicit Victim D for more money. Victim D diligently tracked all funds he provided to SHIELDS, and he had SHIELDS sign numerous promissory notes acknowledging receipt of the money. The final promissory note, signed August 13, 2025, reflects that SHIELDS had received $1,467,852 from Victim D.

49. To maintain the fraud scheme, SHIELDS showed Victim D fraudulent checks that she represented as "collateral." These included two fake Farmers Insurance checks for supposed "death benefits" totaling over $2,500,000. SHIELDS also presented Victim D with a fictitious $3,000,000 "trust fund" gift check from "Frank and Mary Mueller," claiming that the gift check could not be deposited until after August 1, 2026, and that the funds would become accessible once IRS levies were resolved.

50. After August 1, 2026, Victim D asked SHIELDS about the status of the $3,000,000 gift-check deposit. SHIELDS told Victim D that Chase Bank would not deposit the check because of supposed IRS issues. Chase Bank records obtained and reviewed by investigators confirm that

SHIELDS had no accounts there. Additionally, investigators confirmed that the listed address for "Frank and Mary Mueller" in Brookfield, Wisconsin does not exist and that no individuals with those names are known to reside together in Brookfield.

51. Believing SHIELDS's false representations, Victim D continued to make repeated large withdrawals from his retirement and brokerage accounts by ACH transfers, incurring substantial tax liabilities.

52. Bank records reviewed by investigators to date confirm that Victim D provided approximately $2,300,000 to JUAREZ.

***Consensually Monitored Phone Call***

53. During law enforcement's interview with Victim D on August 26, 2026, Victim D agreed to place an electronically monitored phone call to SHIELDS at 262-765-6482. Investigators recorded and observed the call in real time.

54. During the call, Victim D told SHIELDS that police were asking questions about JUAREZ because of the checks Victim D had sent him. SHIELDS immediately responded, "yeah but the money was for me and my IRS debt, it wasn't for him." Victim D then told SHIELDS that police informed him JUAREZ was not an attorney, and SHIELDS falsely replied, "yes, he has an attorney license, and yes, he does all financial shit." When Victim D asked SHIELDS how she got into contact with JUAREZ, SHIELDS responded, "I cleaned for one of his friends for years, he's like a financial attorney."

55. Victim D also asked SHIELDS if there was any news about the previously rejected $3,000,000 trust-fund check. SHIELDS responded, "No, they said that IRS has everything frozen because of me paying that amount of money for federal taxes and that I am under investigation for borrowing that much money."

56. SHIELDS asked Victim D why law enforcement was interested in JUAREZ and falsely indicated that JUAREZ had used Victim D's money to pay her "tax debt," as Victim D intended, saying, "He didn't defraud me; I have the receipts and everything got paid. Or is he under investigation and they're just asking everyone who wrote checks through him?" She continued, "well he made all of my payments ["tax" payments] and didn't steal the money, so why is that a crime? Maybe he got in trouble for something else, so I am not going to talk to him anymore."

57. Bank records show that JUAREZ spent Victim D's funds primarily at casinos and via cash withdrawals; he did not pay any tax liabilities.

***JUG Bank Records***

58. Bank records show that JUG opened multiple accounts between 2023 and 2026 that received large deposits from Victim A, Victim B, and Victim C. These deposits were immediately followed by cash withdrawals, transfers to peer-to-peer payment platforms, and personal spending inconsistent with any legitimate business or IRS-related payments.

59. Educators Credit Union account x0991, opened June 29, 2023, for which JUG was the sole signatory, received approximately $193,100 in deposits from Victim B and Victim C between September 5, 2023, and August 22, 2024. Investigators observed that these deposits were quickly depleted through large cash withdrawals, CashApp transfers to her own CashApp account and to JUAREZ, and purchases at hotels, rental-car companies, and luxury retailers. No IRS payments or legitimate investment activity appeared in the account. The financial institution later closed the account.

60. On October 6, 2024, JUG opened UW Credit Union account x8701, for which she was the sole signatory. The account later received approximately $182,073 from Victim A and Victim C, including the $63,073.03 BMO Bank cashier's check Victim A provided after JUG falsely claimed

she owed IRS debt. JUG immediately conducted three structured withdrawals ($6,000; $7,000; $5,000) and directed the remaining funds to CashApp and Apple Cash. A separate $40,000 "business loan" check from Victim C was similarly followed by a $7,000 cash withdrawal and transfers to JUG's own CashApp, with no business-related expenditures documented.

61. On November 5, 2025, Victim A opened UWCU account x8201, and JUG was added as a joint signer shortly thereafter. The day after she was added, Victim A deposited $80,000 intended to cover JUG's expenses while she awaited a fictitious "Aurora Hospital" settlement. Between December 22, 2025, and February 24, 2026, JUG transferred $24,310 from the shared account (x8201) into her personal UWCU account (x8701), then used the funds for Apple Cash and CashApp payments. Additionally, the shared account showed $27,302 in cash withdrawals and purchases at Lululemon, Alo Yoga, Sephora, Dick's Sporting Goods, Harry Glinberg Jewelers, and hotel stays at Holiday Inn and Sybaris Pool Suites—all occurring after the $80,000 deposit by Victim A.

62. On April 4, 2026, after being told that JUG and SHIELDS needed $220,000 to purchase a transportation business from JUAREZ, Victim A deposited $220,000 into the shared UWCU account (x8201). Two days later, JUG transferred $210,000 into her personal UWCU account (x8701) and then wired $110,000 to JUAREZ's personal Wells Fargo checking account x4270. After the transfer, UWCU requested Wells Fargo return the funds due to suspected fraud. On May 21, 2026, UWCU received $108,500 back from Wells Fargo and issued it via cashier's check to Victim A, who then immediately deposited it into a new US Bank account. On June 2, 2026, Victim A withdrew $109,000 from that US Bank account, in the form of two cashier's checks—one payable to DAVID JUAREZ for $55,000 (memo: land rent) and the other payable to SAVANNAH JUG for $54,000 (memo: property). As noted above, these transactions align with

text messages sent from SHIELDS to Victim A, instructing him about what (false) language to include in the check memo lines, to avoid bank scrutiny.

63. Navy Federal Credit Union records show that JUG opened account x9946, for which she was the sole signatory, on October 8, 2024. On May 4, 2026, this account received a $69,500 check from Victim A with the memo "farmland." Victim A told investigators that JUG added this false memo line to avoid bank scrutiny, and Victim A told investigators the funds were intended for SHIELDS's purported tax liabilities or business investments. Navy Federal ultimately froze the account due to suspected fraud.

64. Across all accounts, JUG repeatedly received victim funds and immediately liquidated the proceeds through cash withdrawals, peer-to-peer transfers, luxury purchases, and transfers to JUAREZ. Investigators identified no IRS payments, business expenses, or legitimate investments in any of JUG's accounts.

***GARDNER Bank Records***

65. On December 16, 2020, GARDNER opened Chase Bank checking account x5562 and savings account x8781, with a listed address on both accounts of **201 Estberg Avenue, Waukesha, Wisconsin 53186.** Bank records show that GARDNER used her Chase Bank checking account x5562 and savings account x8781, opened on December 16, 2020, to receive large sums of victim funds. GARDNER immediately wired those proceeds to accounts belonging to JUG and JUAREZ, where the money was rapidly dissipated through cash withdrawals, CashApp transfers, and casino gambling.

66. On October 11, 2023, GARDNER's checking account received a $32,100 check from Victim B. Six days later, on October 17, 2023, a $140,000 wire transfer from Victim C was deposited into the same account. Within hours, GARDNER withdrew $5,000 in cash and wired

$25,000 to JUG's Educators Credit Union account x0991, labeling the transfer "down payment for condo." After receiving the funds, JUG withdrew $20,000 from her Educators Credit Union account and transferred the remaining balance to her CashApp account.

67. The next day, October 18, 2023, GARDNER wired $102,900 to JUAREZ's Chase Bank account x8015. Immediately after receiving the funds, JUAREZ sent $10,000 to Jordan Shields ("happy birthday") and spent the remaining balance on CashApp transfers and gambling activity at Potawatomi, Ho-Chunk, and other casinos.

68. On November 8, 2023, GARDNER deposited a $154,000 check from Victim C into Chase account x5562. Victim C told investigators this deposit was purportedly for GARDNER to purchase a residence for JUG. However, that residence was never owned by GARDNER. Within two days, GARDNER wired $81,000 to JUG's Educators Credit Union account x0991 and wired the remaining $73,000 to JUAREZ's Chase account x8015. Review of subsequent debits in JUAREZ's and JUG's accounts shows approximately $96,000 sent via CashApp, $50,000 spent at casinos, and $10,000 withdrawn as cash. None of the funds were used for the home purchase that Victim C believed he was financing.

***JUAREZ Bank Records***

69. Bank records show that JUAREZ opened and controlled multiple financial accounts used to receive and launder large volumes of fraud proceeds provided by Victim A, Victim B, Victim C, and Victim D between 2023 and 2026.

70. On July 10, 2023, JUAREZ opened a Chase Bank checking account (x8015), for which he was the sole signatory, listing **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189** as the account address. This account received $111,000 in deposits from Victim B and Victim C, including two $43,000 wires from Victim B that directly matched text messages in which

SHIELDS solicited those exact amounts. Contrary to Victim B's belief that JUAREZ was acting as SHIELDS's attorney and would pay her IRS debt, no IRS payments were found in the account. Instead, JUAREZ wired large portions of the funds to JUG, made substantial CashApp transfers to himself, and spent thousands of dollars at casinos within days of receiving victim funds.

71. On November 21, 2023, JUAREZ opened Wells Fargo account x4270, for which he was the sole signatory, listing **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189** as the account address. JUAREZ listed his occupation as "Buyer" for "RB Wagner." Between May 16, 2024, and February 27, 2026, this account received approximately $1,923,421 in deposits, with $1,800,421 coming directly from Victim D. These funds were accompanied by memo lines such as "loan to JENNIFER," "loan," and "van purchase." Nearly all of the money was quickly spent. Bank records show that JUAREZ spent approximately $1,121,976 at casinos across Wisconsin and Illinois between March 20, 2025, and March 6, 2026. Additionally, JUAREZ transferred hundreds of thousands of dollars to SHIELDS through CashApp, and used victim proceeds for personal expenses including cruise-line charges, mortgage-related payments, and a $15,000 payment to purchase his Chevy Trax SUV.

72. On March 20, 2024, JUAREZ opened Educators Credit Union account x1090, for which he was the sole signatory, listing **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189** as the account address, and listing his job as "Buyer" at "RB Wagner" rather than any legal profession. Between March 20, 2025, and April 24, 2026, this account received $471,265 in victim proceeds, primarily comprised of a $452,265 check from Victim D intended for SHIELDS's purported IRS debt. With these funds, JUAREZ immediately spent approximately $140,000 at casinos, $80,000 through Apple Cash transfers, and $25,000 on credit-card payments. Additional victim-funded debits included $20,000 sent to SHIELDS's son, Austin, and multiple wire

transfers, some of which were over $10,000, to a mortgage company totaling over $40,000. Investigators believe these mortgages payments were related to the purchase of JUAREZ's current residence. Investigators identified no legitimate business expenditures or IRS payments.

73. On April 2, 2026, JUAREZ opened Navy Federal account x7054, for which he was the sole signatory, listing **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189** as the account address. The only deposit into this account was $40,000 from Victim A, with a memo line "trailer/gravel." Victim A later confirmed that this memo had been added by JUG to avoid bank scrutiny. Navy Federal froze the account shortly thereafter due to suspected fraud.

74. Overall, JUAREZ's accounts collectively received well over $2.5 million in victim funds and showed a consistent pattern of rapid transfers to JUG and SHIELDS, large-scale casino gambling, peer-to-peer payments to himself, and personal expenditures, with no evidence of IRS payments or any legitimate business activity.

75. Investigators reviewed IRS tax records for JUG and SHIELDS. Although approximately $664,673.03 in fraud proceeds were deposited into JUG's bank accounts between September 5, 2023, and May 4, 2026, JUG reported only $60,661 in total income on her Form 1040, Individual Income Tax Return, for tax years 2023, 2024, and 2025. On JUG's 2024 Form 1040, she claimed a $14,000 profit as an "entertainer" at Heartbreakers, and on JUG's 2025 return she claimed an $18,000 profit as an "independent artist" at the same establishment. JUG's listed phone number on her 2025 Form 1040 is 414-828-4291, the same telephone number she used to communicate with Victim B.

76. IRS records show that SHIELDS did not file Form 1040, Individual Income Tax Returns, for tax years 2023, 2024, or 2025. As noted above, IRS records also show no liens, levies, or active collection actions against the assets or bank accounts of SHIELDS. Based on victim interviews,

corroborating text messages, and the absence of bank accounts in SHIELDS's name, investigators believe she has been using JUAREZ's bank accounts to facilitate her illegal activities and to evade the assessment of tax. Between September 21, 2023, and May 6, 2026, deposits totaling approximately $2,555,686.00 in fraudulent proceeds were made into JUAREZ's accounts directly from victims, despite no victim reporting direct communication with JUAREZ.

77. On January 20, 2026, JUG filed a Form SS-4 with the IRS to obtain an Employer Identification Number (EIN) for a business listed as "Efficient Transport Associates," with an address of 7638 S. Wingspan Way, Oak Creek, Wisconsin. JUG is the sole member identified on the SS-4, and the business's principal service is listed as "trucking." On July 14, 2026, the Wisconsin Department of Financial Institutions (DFI) confirmed that it found no articles of incorporation or organization for Efficient Transport Associates, and records from the Wisconsin Department of Workforce Development reflect no reportable wages for the entity. Based on my training and experience, I believe Efficient Transport Associates is a shell company created to use the EIN and SS-4 paperwork to open additional bank accounts and continue receiving proceeds of fraud.

***Casino Records***

78. Investigators have reviewed records from Potawatomi, Ho-Chunk, and American Place casinos detailing the gambling activities of JUAREZ, SHIELDS, and JUG. Currency Transaction Reports from these casinos show large cash gambling by SHIELDS and JUAREZ, with activity increasing markedly beginning in 2023, coinciding with the onset of the fraud scheme.

79. American Place Casino (Waukegan, Illinois) records reflect that between April 22, 2023, and May 9, 2025, SHIELDS incurred gambling losses totaling $511,352. Over a similar period—

April 22, 2023, through July 27, 2026—JUAREZ lost $148,882. American Place records further show SHIELDS address to be **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189.**

80. Ho-Chunk Gaming records show that between January 1, 2026, and July 20, 2026, JUAREZ lost $38,120.52. His activity escalated beginning in 2023: in 2023 he visited Ho-Chunk on ninety-two dates with an “Amount In” of $363,071.51 and an “Amount Out” of $336,326.60, compared to 2022, when he visited thirty times with an “Amount In” of $39,448.04 and an “Amount Out” of $37,384.67. Ho-Chunk Gaming records further show JUAREZ’s address to be **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189.**

81. Potawatomi Casino records show that between January 1, 2021, and July 16, 2026, JUAREZ, SHIELDS, and JUG incurred significant losses: JUG lost $19,029.67; JUAREZ lost $154,849.26; SHIELDS lost $871,685.18. Consistent with Ho-Chunk trends, losses at Potawatomi rose around 2023. For SHIELDS specifically, her losses were: 2022—$32,322.52; 2023—$97,207.11; 2024—$114,095.87; 2025—$425,808.97; 2026 (through July 16)—$201,044.48. Potawatomi Casino records further show JUAREZ and SHIELDS both have an address of **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189.**

82. Across all three casinos, cumulative losses were $1,744,009.76 (JUG: $19,120.80; JUAREZ: $341,851.78; SHIELDS: $1,383,037.18) with the majority of losses occurring during the fraud period. Currency Transaction Reports further show SHIELDS continuing her gambling activity at Potawatomi, including $10,711.00 inserted into gaming machines on August 18, 2026, and $21,972.00 on August 15, 2026.

***Surveillance***

83. On August 5, 2026, investigators conducted surveillance **at 1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189**. In the parking lot outside the residence, investigators observed a

Blue 2016 BMW 328 sedan bearing Wisconsin license plate ATC-8615. Wisconsin DMV records show the vehicle is registered to Austin Shields at that same address. Investigators also noted that no transit vans, cargo vans, or box trucks—vehicles typically associated with a transportation business—were present.

84. Later that day, investigators conducted surveillance at **201 Estberg Avenue, Waukesha, Wisconsin 53186**. Parked in front of the detached garage was a White 2011 Ford Fiesta sedan bearing Wisconsin license plate AET-4373. Wisconsin DMV records show the vehicle is registered to JULIE GARDNER. As with the earlier location, investigators observed no vehicles consistent with the operation of a transportation business.

85. On August 7, 2026, Investigators returned to **1442 Big Bend Road, Unit D**, **Waukesha, Wisconsin 53189** for additional surveillance. In the parking lot, investigators observed a 2018 White Land Rover Discovery bearing Wisconsin license plate BAL-9687. Wisconsin DMV records show the vehicle is registered to DAVID JUAREZ, with a listed address of 424 2nd Avenue, Antigo, Wisconsin 54409.

86. On August 10 and August 11, 2026, investigators again surveilled **1442 Big Bend Road, Unit D**, **Waukesha, Wisconsin 53189**. On both dates, a gray Chevrolet Trax SUV bearing Wisconsin license plate ATD-9053 was parked outside the residence. Wisconsin DMV records show the vehicle is registered to DAVID JUAREZ.

87. On August 26, 2026, investigators received subpoenaed records from Boucher Chevrolet in Waukesha regarding the Chevrolet Trax. Records show JUAREZ purchased the vehicle on May 10, 2025, for $27,485, paying $15,000 upfront and financing the remaining $19,735.65 through GM Financial. The lienholder was listed as GM Financial, and the purchase documents listed JUAREZ's address as **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189**. Investigators

traced the upfront payment to one of JUAREZ's bank accounts that contained millions of dollars in fraud proceeds, primarily from Victim D.

88. On September 1, 2026, Investigators once again conducted surveillance at **1442 Big Bend Road, Unit D**, **Waukesha, Wisconsin 53189**. In the parking lot outside the residence, investigators observed a dark-colored 2013 BMW 328 sedan bearing Wisconsin license plate BAC-2715. Law enforcement records show the vehicle is registered to JUG at that same address. Later that evening, investigators saw SHIELDS arrive in the white Land Rover Discovery registered to JUAREZ. Investigators observed SHIELDS and JUG exit the vehicle and enter **1442 Big Bend Road, Unit D, Waukesha, Wisconsin 53189.**

***Vehicles***

89. *White 2021 Chevrolet Silverado- Crew Pickup, Wisconsin License Plate: WP2555, VIN: 1GCUYEET5MZ192060*. This vehicle (the "Chevrolet Silverado") is registered to David Juarez at **1442 Big Bend Rd, Unit D, Waukesha, WI 53189**. Dealership records from Boucher Hyundai of Waukesha show that the vehicle was purchased for $40,626 on 2/12/26. As part of the purchase, JUAREZ made a $10,000 cash down payment—an amount likely chosen to avoid the dealership filing a Form 8300, which is triggered by cash payments over $10,000.

90. On 2/27/26, a $46,000 check was issued to JUAREZ from Victim A's Landmark Credit Union account ending in x2421 for a "van purchase." This check was deposited into JUAREZ's Wells Fargo checking account (ending in x4270) on 3/4/26. The account does not show any subsequent vehicle purchases.

91. On 3/12/26, SHIELDS texted Victim A stating, "the plates came for the truck van," and sent a photograph showing a partial license plate reading "WP55." This matches part of the license plate found on the Chevy Silverado purchased by JUAREZ. During surveillance, investigators did

not observe any indication that the truck was being used for delivery or transportation services. Instead, it remained stationary at JUAREZ's workplace and in the parking lot outside his residence.

92. *White 2018 Land Rover Discovery SUV, Wisconsin License Plate BAL-9687, VIN: SALRR2RV7JA069425*. This vehicle is registered to JUAREZ. During the recent surveillance described above, SHIELDS was seen driving it. Dealership records, from Auto House Waukesha, show that it was purchased by JUAREZ for $16,527.64 on 4/2/25. Wells Fargo bank records show a $16,527.64 debit from JUAREZ's checking account (x4270) on 4/2/25 that occurred at Auto House Waukesha. Prior to this debit, on 3/31/25, a $110,000 check from Victim D was deposited into JUAREZ's Wells Fargo checking account (x4270). This check, along with similar fraudulent checks from Victim D, comprised the vast majority of deposits made into JUAREZ's Wells Fargo account.

93. *Gray 2025 Chevy Trax SUV, Wisconsin License Plate ATD-9053, VIN: KL77LKEP8SC222176*. This vehicle is registered to JUAREZ at **1442 Big Bend Rd, Unit D, Waukesha, WI 53189**. During the recent surveillance described above, Austin Shields, JUG's children's father and SHIELDS's son, was seen driving it. Dealership records, from Boucher Chevy of Waukesha, show JUAREZ purchased it for $28,483 on 5/10/25. JUAREZ made a $15,000 down payment on the vehicle that was shown on the motor vehicle purchase contract. Wells Fargo bank records show a $15,000 debit that posted on 5/12/25 from JUAREZ's checking account (x4270). This debit occurred at Boucher Chevrolet.

94. *White 2011 Ford Fiesta, Wisconsin License Plate: AET-4373, VIN: 3FADH4BJ1BM109082.* This vehicle is registered to GARDNER at **201 Estberg Avenue, Waukesha, WI 53186**. During the surveillance described above, specifically on August 5, 2026,

investigators observed this vehicle parked at the residence (GARDNER's residence), outside the detached garage.

95. Evidence inside the Chevrolet Silverado is likely to show its actual ownership, and that the vehicle is not actually a delivery van for SHIELDS's and JUG's business, as they claimed to Victim A.

96. Further, with respect to each of these personal vehicles described above, I know from my training and experience that, just like residences, personal vehicles are common places where people store documents and electronic devices, which are likely to contain evidence of financial transactions, billing records, payment ledgers, bank statements, communications, and records showing the receipt and disposition of funds and assets.

**COMPUTERS, CELLPHONES, ELECTRONIC STORAGE, FORENSIC ANALYSIS**

97. As described above and in Attachment B, this application seeks permission to search for evidence that might be found at JUG, SHIELDS, JUAREZ's, and GARDNER's, residences, and/or on the person of JUG, SHIELDS, JUAREZ, and GARDNER, in whatever form is it found. One form in which the evidence might be found is data stored on a computer's hard drive, cellphone, or other storage media. Thus, the warrant for which I am applying would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

98. *Probable cause*. I submit that if a computer, cellphone, or storage medium is found at 1442 Big Bend Rd, Unit D, Waukesha WI 53189, 201 Estberg Ave, Waukesha, WI 53186, and/or on the person of JUG, SHIELDS, JUAREZ, or GARDNER, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

99. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in 1442 Big Bend Rd, Unit D, Waukesha WI 53189, 201 Estberg Ave, Waukesha, WI 53186, and/or on the person of JUG, SHIELDS, JUAREZ, or GARDNER, because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of

peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti- virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement)

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

100. *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of a warrant location for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the warrant location, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time at the site of the warrant could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and

configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the warrant location. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

101. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

102. Because several people may share these business locations, it is possible that the residences will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**BIOMETIC UNLOCK**

103. The warrant I am applying for would permit law enforcement to obtain from SAVANNAH JUG, JENNIFER SHIELDS, DAVID JUAREZ, and JULIE GARDNER the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following.

104. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

105. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

106. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

107. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to

unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

108. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

109. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of SAVANNAH JUG, JENNIFER

SHIELDS, DAVID JUAREZ, and JULIE GARDNER to the fingerprint scanner of the device; (2) hold the device in front of the face of SAVANNAH JUG, JENNIFER SHIELDS, DAVID JUAREZ, and JULIE GARDNER and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCULSION

110. Investigators have identified, to date, a total of $3,591,559.03 in fraudulent proceeds from Victim A, Victim B, Victim C, and Victim D that were deposited into bank accounts belonging to JUG, GARDNER, and JUAREZ. Specifically, accounts belonging to JUG received $664,673.03; accounts belonging to GARDNER received $371,200.00; and accounts belonging to JUAREZ received $2,555,686.00. Based on the evidence obtained, and the absence of almost any bank account associated with SHIELDS, investigators believe that SHIELDS had access to JUAREZ's accounts and directed victims to send the majority of the fraudulent proceeds to him.

111. Based on the foregoing, there is probable cause to believe evidence of violations by JUAREZ, SHIELDS, JUG, and GARDNER of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), and Title 26, United States Code, Sections 7201 (evasion of assessment) and 7206(1) (false returns), will be found in the places and on the devices identified in Attachment A.

112. I respectfully request a search warrant to be authorized for the search of the **1442 Big Bend Rd, Unit D, Waukesha WI 53189, 201 Estberg Ave, Waukesha, WI 53186**, including on-site storage units and garages, and the target vehicles if present on-site, and the persons of JUG, SHIELDS, JUAREZ, and GARDNER, described in Attachment A, to recover and seize evidence described in Attachment B, in any form, including on any cellular phone or electronic device.

**EXHIBIT 1**

**ATTACHMENT A**

*Persons and Property to Be Searched*

1. The person and effects of SAVANNAH JUG (09/06/1999)

2. The person and effects of JENNIFER SHIELDS (02/04/1980)

3. The person and effects of DAVID JUAREZ (03/04/1980)

4. The person and effects of JULIE GARDNER (12/26/1962)

5. The residence located at 1442 Big Bend Rd, Unit D, Waukesha WI 53189, including any cellular devices or computers located on-site, and including any of the following vehicles, if present on-site in the building's parking lot:

   a. White 2021 Chevrolet Silverado- Crew Pickup, Wisconsin License Plate: WP2555, VIN: 1GCUYEET5MZ192060

   b. White 2018 Land Rover Discovery SUV, Wisconsin License Plate BAL-9687, VIN: SALRR2RV7JA069425

   c. Gray 2025 Chevy Trax SUV, Wisconsin License Plate ATD-9053, VIN: KL77LKEP8SC222176

   This residence is a multi-unit apartment building constructed with brown brick and gray paneling. A parking lot is located on the south side of the building. The address "1442" is displayed at the top center of the structure. Unit "D" is marked in large lettering beneath an exterior window situated in the center of the building facing the parking lot. A sidewalk extends from the parking lot to the light-colored entry door of Unit "D."



**EXHIBIT 1**

6. The residence located at 201 Estberg Ave, Waukesha, WI 53186, including any cellular devices or computers located on-site, including any garage or outbuilding on-site, and including the following vehicle, if present on-site:

   a. White 2011 Ford Fiesta, Wisconsin License Plate: AET-4373, VIN: 3FADH4BJ1BM109082

   This residence is a house with blue siding. The detached garage is located south of the house and is gray in color, with the garage door facing east. A concrete driveway off Garfield Avenue provides access to the garage. From Estberg Avenue, a concrete walkway leads up to the steps of the house.





**EXHIBIT 1**

## ATTACHMENT B

*Items to be Seized*

1. All records relating to violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering and money laundering conspiracy), and 1957 (unlawful monetary transactions), and Title 26, United States Code, Sections 7201 (evasion of assessment) and 7206(1) (false returns), those violations involving Savannah Jug, Jennifer Shields, David Juarez, and/or Julie Gardner, and others known and unknown, since January 1, 2022, including but not limited to:

a. Banking records for any account used by or associated with the subjects or entities involved in the scheme, including account statements, checks, wire/ACH documentation, cashier's checks, money orders, deposit/withdrawal slips, loan documents, balance notes, and related financial materials.

b. Documents showing the receipt, movement, concealment, transfer, or expenditure of funds, including ledgers, notebooks, spreadsheets, handwritten notes, receipts, and records of Apple Cash, CashApp, Zelle, Venmo, or similar payment platforms.

c. Records relating to the financing or purchase of vehicles or real estate properties.

d. Books, records, receipts, bank statements, money drafts, letters of credit, passbooks, and other documents evidencing the obtaining, transfer, concealment, or expenditure of money.

e. Any income records documenting receipt, expenditure, or accounting of business or personal funds.

f. Any forged, fraudulent, or counterfeit documentation used in the scheme, including but not limited to:

i. Fake IRS Forms 668 D and other tax correspondence

ii. Lien/levy notices

iii. Fraudulent settlement agreements and disbursement sheets

iv. Promissory notes, IOUs, collateral pledges, repayment guarantees

v. Counterfeit insurance claim checks

vi. Fake land contracts and real estate purchase agreements

g. IRS-related documents connected to any subject of the investigation.

h. All documents associated with "Efficient Transport Associates," including EIN filings, formation paperwork, ledgers, invoices, client lists, and bank-account opening materials.

i. Notes, journals, victim tracking sheets, scripts or pitches for obtaining money, address books, contact lists, and any documentation reflecting targeting or grooming of elderly or vulnerable individuals.

j. Screenshots, photographs, images, or media sent to victims in furtherance of the scheme.

k. Correspondence related to daily business operations, including notes, emails, memos, letters, and recordings.

l. Books, records, notes, or papers related to the transportation or movement of U.S. currency.

m. Government-issued identification documents, mail, leases, utility bills, access cards, keys, or any items showing ownership, occupancy, or control of property, bank accounts, electronic devices, or cloud accounts.

n. Any indicia of residency or control identifying persons connected to the proceeds of fraud.

o. Player cards, casino membership records, win/loss statements, cage receipts, slot vouchers, redemption tickets, ATM receipts, withdrawal records, or gambling logs reflecting transactions involving victim funds.

p. Photographs or videos depicting any subject or associates in relation to the movement or trafficking of U.S. currency.

q. Bulk currency and/or items related to the acquisition and disposition of the proceeds of the subject offenses.

2. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded (hereinafter, "electronic storage device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a. Evidence of who used, owned, or controlled the electronic storage device at the time the things described in this Search and Seizure Warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords,

documents, browsing history, user profiles, email, email contacts, “chat,” instant messaging logs, photographs, and correspondence.

b. Evidence of software that would allow others to control the electronic storage device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c. Evidence of the lack of such malicious software.

d. Evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to the crime under investigation.

e. Evidence indicating the electronic storage device user's location and state of mind as it relates to the crime under investigation including but not limited to knowledge, intent, planning, scheme, and/or motive.

f. Evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence.

g. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device.

h. Evidence of the times the electronic storage device was used.

i. Passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. Documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and

k. Contextual information necessary to understand the evidence described herein.

l. Records and things evidencing the use of the Internet Protocol address including:

m. Routers, modems, and network equipment used to connect electronic storage devices to the Internet;

n. Records of Internet Protocol addresses used; and

o. Records of Internet activity, including firewall logs, caches, browser history and cookies, “bookmarked” or “favorite” web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**EXHIBIT 1**

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, IRS-CI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.